The Honorable Judge Ricardo Martinez

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,           )
                                    )
                    Plaintiff,      )     Cause No. CR08-246RSM
                                    )
        v.                          )     **Defendant's Sentencing Memorandum**
                                    )
CHRISTOPHER G. BROOKS,              )
                                    )
                    Defendant.      )
_____ )

Comes now the defendant, Christopher Brooks, through his attorney, Peter A. Camiel, and submits this memorandum for the Court's consideration in determining the appropriate sentence in this case.

### Defense Recommendation

Defense counsel recommends that the Court impose a sentence of 36 months of imprisonment, restitution, the mandatory penalty assessment and three years of supervised release following incarceration. Mr. Brooks asks that the Court recommend to the Federal Bureau of Prisons that he be allowed to participate in the federal drug / alcohol 500 hour treatment program. It is also requested that the Court recommend to the Federal Bureau of Prisons that Mr. Brooks serve his time at the Federal Prison Camp at Sheridan, Oregon.

### Background

Christopher Brooks is before the Court having entered a plea of guilty to conspiracy to commit wire fraud. The essence of the offense was that Christopher engaged "straw buyers" with good credit

**Def. Sentencing Memo - 1**

to act as purchasers of real estate and apply for mortgage loans when in fact, those "straw buyers" would not be residing in the homes and were not the true purchasers of the homes. The straw buyers were paid a fee by Mr. Brooks for use of their names and credit histories.   Christopher Brooks would assist in preparing the mortgage loan applications which would fraudulently indicate that the homes were to be occupied by the borrowers as their primary residence and would also often have false or inflated employment and income information.  The purpose of the scheme was to allow Christopher Brooks to purchase homes, and then "flip" the homes or  remodel or fix up and resell the homes at a profit.  A second purpose of the loan scheme was to allow Mr. Brooks company, Peachtree Development, to receive commissions paid at the time of closing directly from the loan proceeds.  The funds paid to Peachtree Development were openly documented and disbursed by the escrow agents at the time of closing on the properties.  There is no allegation that the receipt of those funds was a part of the fraud. The scheme fell apart when the housing bubble burst and homes stopped selling and home prices began to plummet.  Mr. Brooks was not able to either resell the properties or rent them out for sufficient rents to cover the mortgages.   Houses then began going into foreclosure leading to the discovery of the fraudulent information in the bank loan applications.  This led to damage to the straw buyer's credit, losses to the lenders and sometimes eviction for tenants who had rented the homes.

**Christopher Brooks Did Not Intend Harm**

Mr. Brooks fully admits that he engaged in wire fraud.  He did not, however, enter into the scheme with the intent of stealing from or harming anyone.  This case is not similar to an identity theft case where individual's identities are stolen and then used to steal money from that individual from others. This case is also not similar to a Ponzi scheme type fraud.  Instead, Christopher Brooks wrongly believed that he would be able to take the homes that were purchased, fix them up and then resell them at a profit or rent them out thus allowing full payment of the mortgages. He never intended for the straw buyers to have their credit harmed nor did he intend for the lenders to lose money.   For a while, the scheme worked but when the housing bubble burst, it all fell apart and he was left with unsold homes.  The houses then went into foreclosure.

**Def. Sentencing Memo - 2**

1      The PSR notes that Mr. Brooks received $1.6 million dollars through Peachtree Development.

2 What is unstated in the PSR is that a good deal of that money went toward making mortgage payments

3 on the homes.  While it is true that for a time Mr. Brooks acquired some luxury items like nice cars and

4 furniture from the proceeds,  by the time of his arrest he had very little to show for the scheme as he

5 began liquidating assets to try to keep up with mortgage payments.  A home visit by the probation officer

6 verified that Mr. Brooks sold his personal belongings.  The probation credit check revealed Mr. Brooks

7 is now deeply in debt.

8      Christopher Brooks did not dream up this scheme by himself.  Initially, as he was attempting to

9 purchase and resell homes, he was encouraged by mortgage loan officers to use straw buyers or to inflate

10 the employment and income information in order to qualify for mortgage loans.  The financial institutions

11 in this case, although listed by the government as victims, were often more akin to unindicted co-

12 conspirators who not only encouraged Mr. Brooks to come in with more and more mortgage loan

13 applications, but also profited from the loans that he produced.   The banks encouraged and even

14 suggested no document type loans where the only information that was needed was a good credit score

15 but no income or asset documentation was needed.  Bank and mortgage officers commonly referred to

16 these as "liar's loans."  None of this detracts from Mr. Brooks' culpability nor is it a defense to the

17 charge, but nevertheless it should be considered by the Court.

18      Probation also suggests there was an effort to get home sellers to overstate the value of their

19 homes.  However the government has not suggested that there was any fraud with regard to home

20 appraisals.  The true fraud was in the information put on the mortgage loan applications.

21 **Who is Christopher Brooks?**

22      Christopher Brooks is 39 years old.  He was born and raised in Seattle.  He was primarily raised

23 by his mother since his parents divorced when he was very young and his father started a new family and

24 had little time for his prior family.   The divorce was devastating to Christopher as he had been very close

25 with his father.  Christopher's memories of his father include alcoholism and physical abuse.   After

26 Christopher's father left his mother eventually began a long term relationship with a married man

27 Abraham Jackson. Mr. Jackson became a male role model for Christsopher.  Unfortunately Mr. Jackson

28 **Def. Sentencing Memo - 3**

was also an alcoholic.  Christopher's mother was a hardworking woman who owned and ran two small grocery stores.  From the time he was a very young boy, Christopher worked at the grocery stores alongside his mother stocking shelves, taking inventory and working the cash register.

Christopher struggled in school.  Probably as a result of depression he was suffering as a boy, he had repeated behavioral problems and was moved to a number of schools.  His mother had him see a child therapist for several sessions.  She told the probation officer she regrets not getting more counseling for her son when he was young and further explained that counseling was frowned upon in the community at that time.

Although he did not finish high school at Franklin High Christopher attended North Seattle Community College and obtained enough credits to graduate from high school.

Christopher first began using alcohol when he was a pre-teenager and this continued up until his arrest.  By the time this offense came to light and he was arrested, he was drinking heavily on a daily basis.  Evidence of his alcohol abuse includes an arrest in 2005 that resulted in a reckless driving conviction which was a reduction from a DUI charge.  The alcohol abuse clearly played a role in Christopher Brooks exercise of poor judgement.  For years he drank on heavily on a daily basis.  Mr. Brooks has never been involved in an alcohol treatment program.  He wants to participate in the BOP drug/alcohol program.  He has recognized how his abuse of alcohol has negatively affected his life.

**Christopher Brooks is a Good Father**

At the time of his initial  arrest Christopher Brooks had custody of his four children.  Probation misunderstood Mr. Brooks' statements regarding custody of his children.  He had custody of all four of his children  up until his initial arrest.  At the time of his arrest, the children were taken by C.P.S. officers to his ex-wife.    After being released on pretrial supervision, Mr. Brooks regained custody.  He subsequently allowed his ex-wife to have an extended visit  while the Bellevue School District was on strike.  She then refused to return the children.  Mr. Brooks was subsequently rearrested on the supervised release violations.

Contrary to the probation officer's assessment, Christopher Brooks is a caring, devoted and concerned father.  Christopher Brooks was married in 1993 to Kimberly Brooks.  The couple had four

**Def. Sentencing Memo - 4**

1   children, Carea now age 16, Sarah age 15, Kimberly age 11 and Christopher II who is now 8.  They lived

2   their entire marriage on Beacon Hill in Seattle and were divorced in 2001.  For the next several years,

3   there was an ongoing custody battle as Christopher fought for custody of his children.  Eventually

4   Christopher was awarded custody of his children and they came to live with him, his mother and his new

5   wife, Amani.  One reason for custody going to Christopher was the fact a boyfriend of his former wife

6   abused one of his daughters.

7          In Christopher's care, his four children flourished.  His oldest daughter, Carea, went from barely

8   passing grades to Honor Roll.  Christopher sent Carea, who was struggling in school to live in Virginia

9   with his sister and to attend a private school Oak Hill Academy. By the end of the year she was on the

10  Honor roll.  His daughter, Sarah, who had been in special education was tested and removed from special

11  education and now has a grade point average of 3.2. Mr. Brooks is extremely proud of his children and

12  loves them dearly.

13                          **Advisory Sentencing Guideline Calculations**

14         Defense counsel calculates Christopher Brooks' sentencing guidelines as follows:

15         Base Offense Level                              7
           Loss Amount of over one million dollars      +16
16         Over ten victims                              + 2

17
           Role in the Offense                           + 2
18         Total Offense Level:                          27
           Acceptance of Responsibility                 - 3
19         Adjusted Offense Level                        24

20         Defendant objects to the 2 level enhancement suggested in the PSR pursuant to USSG

21  2B1.1(b)(14)(a) for over one million dollars derived from a financial institution.  The addition of these

22  2 points amounts to a double counting.  The one million dollars derived from the banks  is already

23  included in the loss amount for which Mr. Brooks is receiving a 16 level enhancement.

24         Defendant also objects to the 4 level enhancement suggested in the PSR for a role in the offense.

25   Both the government and the defense agree only a 2 level enhancement should apply.  Christopher

26  Brooks should receive the roll enhancement for directing his wife Amani in this offense.

27

28  **Def. Sentencing Memo - 5**

**Criminal History**

Christopher Brooks has no prior felony convictions.  He has a number of prior convictions for suspended license charges or other non-violent misdemeanor offenses.  Of the 8 criminal history points calculated by probation 4 of the points arise from a 2005 reckless driving conviction and a 2006 suspended license conviction for which Mr. Brooks was still on unsupervised probation at the time of the current offense.  Mr. Brooks is in full compliance with his sentence conditions in both of those two cases.  Normally neither the suspended license or reckless driving offenses would be counted at all pursuant to 4A1.2(c)(1), however, since the terms of probation in each case were for over one year they technically are counted.  Two points were also added to the criminal history score  as a result of a 1996 misdemeanor harassment offense which is now over 12 years old.  That offense is only being counted because the term of supervision did not end until 2000.  Finally, one point was added for a 1997 misdemeanor concealed weapon charge.  Probation in that case was completed in 1998, over ten years ago.

Defense counsel believes that the criminal history score is actually unfairly overstated by the Probation Department's calculation of 8 criminal history points. Mr. Brooks is being treated as if he had several felony convictions when he has none.

If the Court were to find Christopher Brooks' criminal history overstated and placed him in criminal history category II with an adjusted offense level of 24, his advisory guideline sentencing range would be 57 to 71 months.  Category II would recognize either 2 or 3 criminal history points which is a more fair view of Mr. Brooks actual criminal history based on the age and nature of his prior convictions.

**The Lengthy Sentence Recommended by Probation is
Both Unreasonable and Unnecessary**

The Probation Department has recommended a sentence of 110 months.  Such a sentence would be both unreasonable and unnecessary.  It appears that although Probation describes the sentencing guidelines as "advisory," they continue to treat the guidelines as presumptively reasonable despite recent strong language in recent Supreme Court authority to the contrary.

**Def. Sentencing Memo - 6**

**18 USC § 3553(a)**

The requirement of Section 3553(a) instructs the Court to "impose a sentence sufficient but not greater than necessary...". That requirement is re-emphasized in 18 USC §3583 governing imposition of sentences of imprisonment. That section specifically states:

> "The Court, in determining whether to impose the term of imprisonment, and if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factor set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation."

Based on the foregoing, the real question before the Court is how much time is sufficient, but not more than necessary.

### The History and Characteristics of Mr. Brooks

As described in detail above, Mr. Brooks is before the Court for his first felony conviction. He grew up in relatively modest means, has suffered from alcoholism for many years yet he has been a good father and expressed remorse for his conduct. As a result of his conviction, his future employment, including any employment in real estate or the mortgage industry will be dramatically curtailed.

Mr. Brooks has a long history demonstrating a strong work ethic. As a youth he worked in his mother's grocery store. As a teenager he worked at Goodwill Industries on the loading dock. He worked for the Seattle Times in sales for several years when he was in his early 20's. He then worked in Alaska as a commercial fisherman for four years. He began in the real estate industry in 1998 for Century 21. He then went out on his own to work as a mortgage loan officer and real estate investor.

### The Nature and Circumstances of the Offense

The nature and circumstances of the offense are without question serious. Mr. Brooks has accepted responsibility for the offense and recognizes the harm that he has caused. Nevertheless, his actions in the case were not the result of an evil motive but rather the result of a reckless desire to better himself materially by doing what he saw others all around doing in the mortgage, banking and real estate industry.

**Def. Sentencing Memo - 7**

**The Need for the Sentence to Reflect the Seriousness of
Crime, Promote Respect for the Law and Provide for Just Punishment**

In applying all these factors, the Court is still instructed to impose a sentence that is "sufficient, but not greater than necessary" and "to meet this and other needs."

Mr. Brooks will be going to prison. When he comes out he will be deeply in debt and owe substantial restitution. Whether the Court imposes a term suggested by the defense or a term suggested by Probation, the fact will remain that he will now be a convicted felon, he will be removed from the community and his family and sent to prison, and when he is released, he will be on supervision for many years. Those consequences imposed as a result of his conduct will clearly promote respect for the law and provide just punishment.

**Adequate Deterrence**

A sentence as suggested by the defense given all the circumstances in this case is more than adequate to deter both Mr. Brooks from committing such crimes in the future and to deter others from engaging in the same kind of conduct. The truth is that Mr. Brooks' arrest, detention in jail, experience of being indicted and sentenced to any term in prison will more than deter him from ever putting himself in the position that he finds himself today.

**The Kinds of Sentences that are Available**

Under recent Supreme Court law, it is quite clear that the United States Sentencing Guidelines are not considered presumptively reasonable. Nelson v. United States, ___ S.Ct. ___, 2009 Westlaw 160586 (January 6, 2009). The guidelines are not a starting point in terms of a reasonableness determination nor is a defendant required to demonstrate some exceptional reason to go below the guidelines. Rather, the guidelines are simply one factor for the Court to consider of necessarily no greater weight than other Section 3553 factors. United States v. Carty, 520 F.3d (9th Cir. 2008).

**Avoiding Sentencing Disparity**

While there are not a great number of cases with fact pattern similar to that involving Mr. Brooks, there have been a number of recent sentences involving bank fraud related charges or identity theft type crimes where the sentences handed down by the courts have been significantly less than that being

**Def. Sentencing Memo - 8**

1   recommended by either Probation or the government.    In January 2009, in U.S. v. Aslanyan, CR07-294

2   the defendant  was sentenced to 33 months in prison for stealing approximately $200,000 by skimming

3   debit and credit card numbers from over 300 victims.  In July 2008, a former Microsoft employee in U.S.

4   v.  Gudmundson, CR07-416 was sentenced to 22 months imprisonment for involvement in a fraudulent

5   billing scheme involving over $900,000 in losses.  In 2008, in U.S. v. Hammer, CR08-184, an attorney was

6   sentenced to 36 months in prison for defrauding clients out of $400,000.  In U.S. v. Fielder, CR08-5032,

7   the defendant was sentenced to 24 months in prison for a bank fraud scheme involving approximately

8   $1,000,000 in phony checks.  In December 2007, a former mortgage loan officer, in U.S. v. Juanita Booker,

9   CR07-027 was sentenced to 18 months in prison for conspiracy to commit identity theft involving almost

10  $200,000 in losses.  In U.S. v. Charles Griffin, CR07-27 the defendant was sentenced to approximately 7

11  years in prison for using insiders at a mortgage and escrow company to defraud customers of more than

12  $300,000.  In U.S. v. Alexander Milman , CR06-245, the defendant was sentenced to 63 months in prison

13  which was described by the United States Attorneys Office as the longest prison term for health care fraud

14  ever handed down in Western Washington involving losses of 1.6 million dollars.  In U.S. v. Joseph Lavin,

15  CR07-366 the defendant was sentenced on charges of wire fraud and money laundering to a term of 54

16  months.  That case involved losses of over 11.6 million dollars.  In U.S. v.  Rahsaan Moore, CR06-262 the

17  defendant  was sentenced to 64 months in prison in a bank fraud scheme involving over $500,000 in losses.

18  The former so-called investment guru Wade Cook was sentenced in U.S. v. Cook, CR05-424 to a term of

19  88 months in prison on charges of income tax fraud involving over 3.7 million dollars in losses.

20      Defense counsel has yet to find any sentences imposed in this district comparable to that being

21  recommended by the government against Mr. Brooks for similar crimes.  Cases with longer sentences

22  usually involve Defendants who intentionally steal from vulnerable victims and defendants who often have

23  prior felony convictions for similar offenses.

24                          **Conclusion**

25      Before the Court is a 39 year old father of four children facing his first felony conviction.  In one

26  sense, Mr. Brooks could be looked at as a poster child for the current mortgage problems.  His sentencing

27  comes at a time where there is a national focus on the mortgage loan debacle.  Defense counsel cannot

28  **Def. Sentencing Memo - 9**

1  emphasize enough, however, that Mr. Brooks did not go into the present scheme with the intent to harm

2  anyone or with the intent that anyone would lose any money.  In fact, it was his goal and belief that

3  everyone would make money and no one would lose any money.  Nevertheless, fraud occurred and people

4  did lose money.  As a result, Mr. Brooks understands he should be punished.  At the same time, he has fully

5  accepted responsibility.  In addition, in other aspects of his life, particularly that of being a father, he has

6  demonstrated a high degree of responsibility.  A sentence of 36 months in prison is a substantial term for

7  someone who has never been to prison before.  Christopher will also be saddled with a huge restitution

8  obligation. It is hoped while in prison to take advantage of the drug alcohol treatment programs so that he

9  can come out of prison ready to take on the responsibilities of fatherhood and supporting his family.  The

10 Court is asked to recommend Sheridan Camp as a place of incarceration so that Mr. Brooks will be at the

11 closest possible facility to his children.

12        Dated this 24th day of February, 2009.

13                                                              Respectfully submitted,

14

15                                                                /s/   Peter A. Camiel

16                                                              Peter A. Camiel, WSBA #12596

17

18

19

20

21

22

23

24

25

26

27

28  **Def. Sentencing Memo - 10**

1

CERTIFICATE OF SERVICE

2

3        I hereby certify that on February 24, 2009 I electronically filed the foregoing with the Clerk of the

4  Court using the CM/ECF system which will send notification of such filing to the attorney(s) of record for

5  the defendant(s) and plaintiff.

6

7                                        ___/s/ Peter A. Camiel___

8                                        Attorney for Christopher Brooks

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    **Def. Sentencing Memo - 11**